DECISION AND JUDGMENT ENTRY
This case comes to us on appeal from a judgment of the Lucas County Court of Common Pleas, Juvenile Division, which granted permanent custody of Sherron J. and Joshua R. to appellee Lucas County Children's Services ("LCCS") and terminated the parental rights of appellant Priscilla R., the natural mother of Sherron J. and Joshua R., and James R., the natural father of Joshua R.[1] For the reasons that follow, we affirm the decision of the trial court.
LCCS became involved with appellant in approximately March 1996, when LCCS learned that appellant had left Sherron J., then four years old, in the care of others for several days at a time without informing the caregivers of her whereabouts. On or about June 4, 1996, the trial court found Sherron J. to be a neglected and dependent child and awarded temporary custody to LCCS effective May 15, 1996. A case plan was developed requiring appellant to undergo a psychological evaluation, to follow the recommendations stemming from that evaluation, and to attend parenting classes and counseling.
Shortly thereafter, on June 11, 1996, another child, Jamie R., was born to appellant. On or about February 19, 1997, the trial court found Jamie R. to be dependent and granted temporary custody of her to LCCS, effective January 14, 1997. Ultimately, the trial court awarded legal custody of Jamie R. to her grandmother, effective August 27, 1998. Custody of Jamie R. is not a subject of this appeal.
On June 8, 1997, another child, Joshua R., was born to appellant. Because LCCS had been involved with both Sherron and Jamie, the trial court, on or about September 24, 1997, found Joshua R. to be dependent and ordered that LCCS provide protective supervision for him. Subsequently, on or about March 5, 1998, the trial court awarded legal custody of Sherron J. to appellant, effective February 26, 1998. The trial court also ordered that LCCS provide protective supervision of Sherron J. Protective supervision of both Sherron J. and Joshua R. continued until November 4, 1998, when the proceedings in the instant case were initiated.
Various services were provided to appellant during this period (March 1996 to November 1998), including the help of an in-home aide and the help of a family support worker, Demetra Turner, from the Family and Child Abuse Prevention Center. Despite having this help, LCCS remained concerned about appellant's ability to effectively parent her children because she could not apply lessons from her parenting classes to her real life, because she was unable to protect herself from domestic abuse at the hands of her husband (James R.), because she failed to follow through with counseling, and because her house had no heat in October 1998 due to an outstanding balance on the account. The instant case arises from those concerns and from an incident that occurred during the night of October 31, 1998.
In early November 1998, Jeff Davis, a caseworker for LCCS, investigated an allegation that Sherron J. had been left alone during the night of October 31, 1998. After an investigation, Davis substantiated those allegations. As a result, on January 29, 1999, LCCS filed a complaint in dependency and neglect seeking permanent custody and moving for a shelter care hearing.[2] Following a shelter care hearing on the same day, temporary custody of Sherron J. and Joshua R. was awarded to LCCS.
Following an investigation, Deborah Spychalski, the guardian ad litem/court-appointed special advocate for the children, filed a report with the court in which she recommended that permanent custody of both Sherron and Joshua be awarded to LCCS. Spychalski stated in her report that an award of custody to appellant would not be appropriate because appellant was "low functioning,"[3] because she failed to internalize lessons she had learned from her parenting classes, because she lacked the ability to protect the children from simple risks, and because she lacked the ability to provide the children adequate stimulation, which resulted in developmental delays.On April 19 and 20, 1999, the case proceeded to hearing. Davis, the LCCS caseworker, was the sole witness during the adjudication phase of the hearing. He testified that he substantiated the allegation that appellant left Sherron J. home alone during the night of October 31, 1998. He also testified about the services that were provided to appellant in the months preceding the complaint and about the concerns LCCS continued to have in spite of all of the help provided to her. Following Davis' testimony, the trial court adjudicated Sherron J. and Joshua R. dependent and neglected children, and the case proceeded to the dispositional phase.
Pertinent to this appeal, the first witness to testify at the dispositional phase was Davis, the LCCS caseworker. At this phase of the hearing Davis testified about the services provided to appellant after the complaint, including the continued services of Demetra Turner, the family support worker from the Family and Child Abuse Prevention Center. Again, despite the services, Davis testified that he did not see any significant improvement in the areas of budgeting, housekeeping, and being a responsible parent. He testified that LCCS provided appellant with all possible services and that these services had no real impact. He admitted that appellant had gained employment, but he testified that she was only employed sporadically and had lost two jobs in a couple of months. Davis also testified that appellant has not visited her children regularly in the foster home. When asked whether he was aware that appellant had babysat for both her own children and other foster children when Sherron and Joshua's foster parents were on vacation, Davis conceded that he was aware of that, and stated, "* * * I think Priscilla can provide adequate care for short periods of time when the mood suits Priscilla. That's been my experience."
Barbara Applebaum, who taught parenting classes at Connecting Point, also testified. She stated that both appellant and James R. attended her classes during 1996 and 1997 and that appellant's attendance was sporadic. Applebaum also noted that Jamie R. came with appellant to classes, and that appellant's attention to the child was sporadic as well. She testified as to her concern that, despite the training, appellant would not know what to do with her children in a specific situation.
Next Demetra Turner, the family support worker, testified about her experience working with appellant from approximately June 1997 to approximately April 1999. She testified that she worked with appellant to identify stressors in appellant's life, to assist her in understanding child development, discipline, and the medical needs of children, and to assist her in whatever other way was necessary. When asked whether she had any concerns with appellant's ability to parent a child, Turner testified that one of appellant's most apparent problems was with supervision of the children, including failing to place Joshua in a playpen if she needed to leave the room. Turner testified that on one occasion, she found Joshua (who was sixteen or seventeen months old at the time) alone in the second-story apartment of the duplex with no gates up and with the oven on and the oven door open. Appellant and Sherron were outside in the yard at the time. Turner testified that appellant was rather cavalier about the danger to the infant, saying that the child understood not to touch the stove.
In addition to being concerned about appellant's supervision of her children, Turner testified that she was concerned about appellant's lack of interaction with them. According to Turner, most of the time appellant simply watched TV with her children; appellant did not follow Turner's suggestion that appellant play games with her children, have toys available, or sit down with Sherron to do homework. Turner testified that doing nothing but watching TV was "part of the atmosphere" of the home.
Turner also testified that she tried to work with appellant in improving the cleanliness of her house and the hygiene of the children, but she saw no significant improvement in these areas. For example, instead of accepting Turner's assistance in securing dressers, and instead of using built-in drawers in the hall closet, appellant kept the family's clothes either in garbage bags or in piles in the hallway or just simply on the floor. Turner testified that, in her opinion, the clothes on the floor presented a hazard for Joshua when he was learning to walk. Testifying about the children's hygiene, Turner stated that, even if she visited appellant as late as 3:00 p.m., it would not have been unusual for Joshua to have not yet been washed and to still be wearing a wet diaper. He would "reek" of spoiled milk. Sherron might still be in his pajamas, unbathed, at that hour. Though Turner encouraged appellant to teach Sherron, then six, basic hygiene skills, appellant did not effectively teach Sherron to take care of himself by washing his own face or brushing his own teeth.
Turner testified that she continued to visit appellant's home on a monthly basis after the children were removed. She acknowledged that appellant had gained employment and was working toward her GED, but she stated that she believed appellant did this only as a reaction to her children being removed from her home; despite Turner's encouragement to do these things over a two-year period, appellant did not actually do these things until her children were removed. Turner did not believe that appellant would keep up with these responsibilities on a consistent basis. Generally, Turner testified that appellant only followed through securing suggested resources when Turner was standing right there making sure she did it. If Turner left the responsibility on appellant's shoulders, appellant did not follow through.
When asked on cross-examination whether she believed appellant could provide adequate care for her children with Turner's continued involvement, Turner stated,
 "There is a possibility but then again I've been involved with her for quite a while now and it's taken the actual removal of her children for her to step forward and actually follow through with the services that she had been encouraged to do beforehand, so I'm not sure. She could improve with my continued help or she could just fall back and not do anything."
Similarly, Turner acknowledged on cross-examination that she had, at times, seen appellant demonstrate good parenting skills, but she testified that this was not something that she saw on a consistent basis. Turner testified that, because appellant had attended several parenting classes, she could "spout off" what needed to be done to effectively parent children, but Turner only saw appellant actually practice these skills when Turner encouraged it. Turner testified that she did not believe appellant would follow through on Turner's suggestions without someone helping her.
Appellant testified on her own behalf. She began by describing how she was enrolled once again in a GED program and how she had been employed for the past month at Taco Bell. (She acknowledged that she had recently quit Burger King after being employed there for one month.) She also described her house, a two-bedroom home in a residential neighborhood. She testified that she has appliances and utilities. She stated that she believes her home is an appropriate place for young children.
Appellant disagreed with Turner's and Davis' testimony that appellant did not apply the information she gained from her parenting classes to real-life situations. Appellant testified that she always had food in the home for the children, she always had appropriate clothes for them, and that she sent Sherron to school every day. She disputed Turner's testimony that she did little other than watch TV with her children. According to appellant, she was "very active" with her children: she talked with them, played with them, and watched TV with them. She testified that she helped Sherron with his homework and went to his school every other day to discuss Sherron's behavioral problems with his teacher. While acknowledging that Sherron has behavioral problems, she testified that they are unrelated to her parenting. She testified that she did not visit her children regularly once they were removed because it was too painful for both her and the children. She stated that she is current on all of her bills. Appellant denies that she left Sherron at home alone during the night of October 31, 1998, saying that she left a neighbor in charge of him and she was gone no longer than forty-five minutes.
Appellant stated that she heard Turner and Davis testify that she was irresponsible, but she testified that she obtained her current housing on her own, without any help from Turner or Davis. (Turner acknowledged this fact in her testimony.) Appellant admitted that her house is not well-organized, but she testified that clothing does not sit on the floor. According to appellant, once she washes the children's clothes, she puts them in drawers in the bedroom. She disputed Turner's testimony that the children lacked basic hygiene. Appellant testified that she made sure her children were bathed and wore clean clothes, though she admitted that if she was "just sitting around the house" she would probably let the children walk around until nighttime before bathing them. She stated that she never heard a complaint from school about the children's hygiene. Finally, she testified that she believed she could complete a case plan devised by LCCS for the purpose of reuniting her with her children.
On cross-examination, appellant denied that she ever left Joshua alone in the apartment with the oven on and the oven door open. She disputed Turner's testimony that she did not follow through on Turner's recommendations. Appellant admitted that James R. had been abusive to her and that he had a problem controlling his anger, but she did not believe that "good anger control" is an important quality for a parent. She testified that, although she stopped seeing one counselor because it "wasn't working out," she successfully completed her sessions with the subsequent counselor. However, she admitted that, despite Davis' repeated urging to follow through with a counselor at Connecting Point, she stopped attending those counseling sessions because "it didn't work out too well." She also admitted that she did not seek out any counseling for herself to learn how to deal with Sherron's behavioral problems.
Following the hearing, on June 8, 1999, the trial court filed a judgment entry making the following findings:
 "* * * that Sherron and Joshua cannot be placed with any of the parents within a reasonable time or should not be placed with the parents. They are in need of a legally secure placement which cannot be achieved without a grant of permanent custody to LCCS. Ms. [R] has caused or allowed the children to suffer neglect as described in section 2151.03 of the Revised Code, and the likelihood of recurrence of the neglect makes the children's placement with her a threat to the children's safety. Mr. [R] has demonstrated a lack of commitment toward his child between November 1998 and April 1999 by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child. He has also abandoned the child by failing to visit or otherwise communicate with Joshua for more than a three month period commencing on and after November 4, 1998. By clear and convincing evidence it is in the best interest of the children to grant permanent custody to LCCS. The Court finds that the children are adoptable, that an adoptive placement would positively benefit them and that a grant of permanent custody would facilitate an adoption."
Based on these findings, the court divested appellant and James R. of any parental rights or obligations and granted permanent custody of Sherron and Joshua to LCCS.
Appellant appeals from the trial court's June 8, 1999 judgment entry, setting forth the following assignments of error:
 "I. THE TRIAL COURT ERRED IN FINDING THAT THE LUCAS COUNTY CHILDREN SERVICES BOARD HAD MADE A GOOD FAITH EFFORT TO REUNIFY THE MINOR CHILDREN WITH APPELLANT.
 "II. THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR PERMANENT CUSTODY AS IT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE TO GRANT IT."
To resolve these issues, we must determine whether the lower court complied with R.C. 2151.353 and 2151.414 and whether the evidence was sufficient to support, by clear and convincing evidence, the finding that one or more of the factors listed in R.C. 2151.414(E) exists. In Re Dylan (1997), 121 Ohio App.3d 115, 121. The Supreme Court of Ohio has held that clear and convincing evidence is:
 "* * * that measure or degree of proof which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford
(1954), 161 Ohio St. 469, paragraph three of the syllabus.
Appellant contends in her first assignment of error that the trial court erred in finding that LCCS made a good faith effort to reunify Sherron and Joshua with their mother. Appellant contends that such "diligent efforts" to assist her in remedying her problems are statutorily required under R.C. 2151.414(E)(1). LCCS, on the other hand, contends that it is not statutorily required to make such diligent efforts since it filed a complaint for permanent custody and sought a dispositional order under R.C.2151.353.
In its complaint, LCCS sought an order under R.C.2151.353(A)(4). That section, as it existed at the time the instant complaint was filed, provided:
 "(A) If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:
"* * *.
 "(4) Commit the child to the permanent custody of a public children services agency or private child placing agency, if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child. If the court grants permanent custody under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding."[4]
Former R.C. 2151.414(E) provided:
 "In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. * * *."
While R.C. 2151.414(E)(1) requires case planning and "diligent efforts," that section is only one of several findings that a trial court may make in ordering disposition under R.C.2151.353(A)(4). It appears from the record that the trial court in fact did not make a finding under R.C. 2151.414(E)(1); the court made findings under R.C. 2151.414(E)(4) (regarding James R.) and R.C. 2151.414(E)(10) (regarding appellant).[5] "Diligent efforts" and time to remedy the situation are required only when a court makes a finding under (E)(1). See, e.g., In the Matter of:Mark H., Mindy H. (Apr. 30, 1999), Lucas App. No. L-98-1238, unreported; In re Brandon O. (Jan. 31, 1997), Lucas App. No. L-96-115, unreported. Accordingly, appellant's first assignment of error is not well-taken.
In her second assignment of error, appellant contends that the judgment was against the manifest weight of the evidence because the record evidence establishes that "she completed all actions that were required of her and that the conditions necessitating removal of her children from her home had been remedied." Again, appellant assumes in making this argument that the trial court made a finding under R.C. 2151.414(E)(1). It did not. Nevertheless, because appellant also stated in her brief, "Appellant submits that the trial court did not appropriately consider all the evidence presented at trial, as the LCCSB did not present clear and convincing evidence to support an award of permanent custody," we will construe this assignment of error as a manifest weight challenge to the judgment as a whole.
We note that the testimony at the hearing was conflicting. The trial court apparently resolved the conflict by crediting Turner's and Davis' testimony. Having thoroughly reviewed the record, we cannot disagree with the trial court's resolution of the conflicting testimony. We also find that the trial court considered all relevant evidence, considered the best interests of the children, and made all statutorily required findings. We find that the evidence clearly and convincingly supports the trial court's findings under R.C. 2151.414(E). Accordingly, the second assignment of error is not well-taken.
On consideration whereof, this court finds substantial justice was done the party complaining, and the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the court costs of this appeal.
 _____________________ James R. Sherck, J.
Richard W. Knepper, P.J., Mark L. Pietrykowski, J., Concur.
[1] James R. did not appeal the trial court's decision. For this reason, as we discuss the record, we omit any discussion of those portions of the record pertaining to James R. and his suitability as a parent to Joshua R.
[2] It is undisputed that the original complaint in this matter was filed on November 4, 1998, but was dismissed. The instant complaint is a re-filing of the November 4, 1998 complaint.
[3] A psychologist who examined appellant at the request of the trial court reported that appellant exhibited "borderline intellectual functioning."
[4] Former R.C. 2151.414(D)provided:
 "In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 "(1) The interaction or interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency."
[5] Former R.C. 2151.414(E)(4) provided:
 "The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]"
Former R.C. 2151.414(E)(10) provided:
 "The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety[.]"
R.C. 2151.03 defines "neglected child" as follows:
 (A) As used in this chapter, "neglected child" includes any child:
 (1) Who is abandoned by the child's parents, guardian, or custodian;
 (2) Who lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian;
 (3) Whose parents, guardian, or custodian neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being;
 (4) Whose parents, guardian, or custodian neglects the child or refuses to provide the special care made necessary by the child's mental condition;
 (5) Whose parents, legal guardian, or custodian have placed or attempted to place the child in violation of sections 5103.16 and 5103.17 of the Revised Code;
 (6) Who, because of the omission of the child's parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare;
(7) Who is subjected to out-of-home care child neglect.